UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| D&D UNDERGROUND UTILITIES INC., ) ) Plaintiff, ) ) v. ) ) WALTER MARTIN EXCAVATING INC., ) et al. ) ) Defendant. ) ) | Civil No. 12-241-GFVT **MEMORANDUM OPINION & ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On August 18, 2010, the City of Somerset Gas Department ("Somerset") contracted with Defendant Walter Martin Excavating ("WME") to install a gas line beneath the Rockcastle River. [R. 1 at ¶ 8.] Defendant International Fidelity Insurance Company ("IFIC") issued a payment bond on the project for the benefit of WME. [*Id*. at ¶ 9.] WME contracted with Plaintiff D&D Underground Utilities, Inc., ("D&D") to bore beneath the river and install a 12 inch casing to accommodate the gas line. [*Id*. at ¶ 10.] The circumstances surrounding the performance of this subcontract give rise to the present litigation. Both parties agree that the work was not completed in a timely fashion but disagree as to who is to blame, who is to bear the cost for those delays, and whether delays in payment have been in good faith. The matter is now before the Court on WME's motion for partial summary judgment and D&D's related motion to strike portions of Scott Adam's affidavit. For the reasons that follow, the Partial Motion for Summary Judgment will be **GRANTED** in part and **DENIED** in part and D&D's Motion to Strike will be **DENIED**.

**I**

The contract between Somerset and WME provided that the project was to be completed by November 27, 2010 and that WME would be assessed damages of $400 per day if the project was not completed on time. [R. 37-2 at ¶ 5-6 (Adams Aff.); R. 37-3 (Contract).] After receiving bids, and attempting to do the work themselves, WME entered into a non-written contract with D&D to bore beneath the river and install a 12 inch casing to accommodate the gas line. [R. 1 at ¶ 10; R. 37-2 at ¶ 8 (Adams Aff.); R. 42-1 at ¶¶ 9-10 (Burr Aff.)]

According to Don Burr, the President and Owner of D&D, he discussed the liquidated damages clauses with Shawn Martin, former Vice-President of WME, in advance of agreeing to the project and made it clear that D&D would likely not even get to the project site before the project deadline had passed. [R. 42-1 at ¶ 9 (Burr Aff.)] According to Burr, "Shawn Martin understood that D&D Underground would not be responsible for any liquidated damages."[1] [*Id.* at ¶ 9-10 (Burr Aff.)] The parties agree that the work was to be done for $168,000.[2]

D&D arrived at the site in the third week of November and began work on the project

---

[1]   WME agreed to perform additional work for Somerset "in exchange for the Owner's agreement not to assess liquidated damages against WME." [R. 37-2 at ¶ 8 (Adams Aff)] The parties disagree, however, about whether those liquidated damages were to be assessed because of delays caused by D&D on the project. [*Id.*; R. 42-1 at ¶ 10 (Burr Aff.)] D&D contends that WME's agreement to remove the existing gas line under the river in lieu of Somerset levying liquidated damages was separate and apart from delays caused by D&D. [R. 42 at 4-5; R. 42-1 at ¶ 10 (Burr Aff.)] Arguments about who is to blame for these liquidated damages will become more relevant if, at a later point in this litigation, WME argues that additional offsets be levied against D&D. At this juncture, however, arguments on this point are not directly relevant to the resolution of the pending motions.

[2]   The parties disagree about how $168,000 came to be the contract price. According to WME, the agreement was to perform the work for $168,000 in accordance with the underlying contract. [R. 1 at 10; R. 37-2 at ¶ 8 (Adams Aff.)] D&D disagrees, arguing the agreement was $210 per foot. WME initially estimated the length of the bore at 700 feet (which would have cost $147,000), but the actual footage of the bore was 800 feet ($168,000). [R. 42 at 3; R. 42-1 at ¶ 2 (Burr Aff.)] Ultimately, however, the parties agree that $168,000 is the value of the contract.

soon thereafter. [R. 1 at ¶ 10; R. 37-2 at ¶ 9 (Adams Aff.); R. 42-1 at ¶ 10 (Burr Aff.)] In March 2011, D&D hit a snag when a "reemer head" broke off and became lodged in the bore. [R. 1 at ¶ 12; R. 37-2 at ¶ 10 (Adams Aff.); R. 37-4 at ¶ 9 (Williams Aff.); R. 42-1 at ¶ 14 (Burr Aff.)] The parties disagree about what then ensued. WME contends that D&D tried to retrieve its equipment, but failed and left WME to figure out how to proceed. [R. 37-1 at 3; R. 37-2 at ¶ 10 (Adams Aff.)] According to WME, D&D would not return unless WME retrieved its equipment from beneath the river, but did agree that they (D&D) would be responsible for additional costs incurred in retrieving the equipment. [R. 37-1 at 3; R. 37-2 at ¶ 12 (Adams Aff.); R. 42-1 at ¶ 17 (Burr Aff.)]

D&D admits that WME assisted in trying to recover the equipment but notes that it was very involved in the process too, even breaking a second reemer head in the process of retrieving the first. [R. 42 at 6.] After breaking two reemer heads, D&D concluded that they would have to dig the reemer heads out to recover them, which D&D was prepared to do, but the project was shut down when Somerset's engineer, Vaughn Williams, advised the parties that an environmental assessment was necessary. [R. 1 at ¶ 13; R. 37-1 at 3-4; R. 37-4 at ¶ 11 (Williams Aff.); R. 42 at 6; R. 42-1 at ¶ 17 (Burr Aff.)] The environmental assessment was necessary for two reasons: the removal of existing pipeline by WME and the retrieval of D&D's equipment. [R. 42 at 7; R. 37-4 at ¶ 11 (Williams Aff.)]

The environmental assessment cost WME $17,693.34 and was not completed until late 2011. [R. 37-1 at 4; R. 37-4 at ¶ 14 (Williams Aff.); R. 42 at 7.] D&D returned to the project on December 29, 2011 and completed work in January, 2012. [R. 37-1 at 4; R. 37-4 at ¶¶ 11-12 (Williams Aff.); R. 42-1 at ¶ 18 (Burr Aff.)]

In February 2012, WME was partially paid by the City of Somerset and that payment included compensation for D&D's work on the project. [R. 42 at 9; R. 42-2.] Burr spoke with Shawn Martin, the former Vice-President of WME who worked on the Rockcastle River Project, about payment for D&D's work. [R. 42 at 7; R. 42-1 at ¶ 19 (Burr Aff.)] Burr agreed to two offsets ($5,143.12 for costs incurred in renting a DriPrime pump and $17,693.34 for the environmental assessment) based on Shawn Martin's promise that D&D would be immediately paid. [R. 42 at 8; R. 42-1 at ¶ 19 (Burr Aff.)] The parties exchanged invoices for offsets and payments, and, at the request of WME, D&D provided its banking information to WME but WME did not pay D&D. [R. 42 at 9; R. 42-1 at ¶ 19-21 (Burr Aff.); R. 42-3; R. 42-4.]

On March 30, D&D sent WME a demand letter, demanding payment of $150,788.44. [R. 42 at 9; R. 42-1 at ¶ 22 (Burr Aff.); R. 42-5.] D&D then retained counsel and submitted a claim on the payment bond that WME posted through IFIC. [R. 42 at 9.] While waiting to hear back from IFIC, on July 6, WME sent D&D a letter requesting an additional $130,244.30 in offsets, and offering to pay $45,000 for the work that D&D performed. [R. 37-1 at 4; R. 37-5; R. 42 at 10.] D&D contends this letter and the offsets contained in it were sent in bad faith. [*Id*.] They argue that many of the costs in the letter were not attributable to the delay or else were expenses that WME was required to bear under its contract with Somerset. [R. 42 at 10.] After rejecting the $45,000 offer, D&D elected to file this suit on December 11, 2012.

On December 20, 2013, Somerset issued a joint check to WME and D&D for $37,755.70 and also a $12,875.96 check made solely to WME. [R. 37-1 at 5; R. 37-7.] On December 26, 2013, more than a year after this lawsuit was filed, and almost two years after D&D had submitted its invoice, WME tendered a check for $43,380.70 to D&D in compensation for the

4

"undisputed amount owed to D&D for its work on the Project and an additional $5,625 for amounts claimed with respect to the Weddle Project." [R. 37-1 at 5; R. 42 at 10-11.]

Despite the somewhat complicated, and very much disputed, factual predicates laid out by both parties, the issues raised in the partial motion for summary judgment are narrow and well defined. First, WME argues that D&D's damages under counts one (Breach of Contract) and three (Unjust Enrichment) are limited to $107,407.74. [R. 37-1 at 6-7.] Second, WME argues that count two, which alleges a violation of the Kentucky Fairness in Construction Act ("FICA"), must be dismissed as a matter of law because there is a good faith dispute regarding D&D's claim. [R. 37-1 at 7.]

Both parties have submitted affidavits to support their motions. WME has produced affidavits from Scott Adams, Senior Manager of WME, and Vaughn Williams, President of Kenvirons, Inc., the engineering firm responsible for preparing the biological assessment and plan for removing D&D's boring equipment and the existing gas pipeline.[3]  [R. 37-2; R. 37-4.] D&D has presented the affidavit of its President and Owner, Don Burr. [R. 42-1.]

## II

### A

Before considering the partial motion for summary judgment, the Court must confront D&D's motion to strike portions of Scott Adams November 14, 2014 affidavit, which D&D contends is not based on his personal knowledge, but is instead inadmissible hearsay. [R. 47.] According to D&D, Adams "has no personal knowledge of these facts because he was never on

---

[3] As will be addressed in more detail, *infra*, D&D objects to the Court considering the affidavit of Scott Adams on the grounds that affidavit contains hearsay. In support of their motion to strike, D&D also supplied the Court with the deposition testimony of Shawn Martin. *See* R. 48.

site and never interacted with anyone from D&D during the project." [R. 42 at 6.] Adams, who is the Senior Manager of WME, attests that his personal knowledge is based on "a detailed review of WME's records kept in the ordinary course of business and discussions with current or former WME employees that were involved in the project." [R. 37-2 at ¶ 2.] In a subsequent deposition, Adams explained that he was not involved in the project and the only "current or former WME employee[]" that he spoke with was Shawn Martin. [R. 47-1 at 2-3.]

D&D argues that Adams' affidavit is not based on personal knowledge, and is hearsay, in violation of Rule 56, which requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In conjunction with their motion to strike, D&D has provided the Court with the sworn statement of Shawn Martin which they offer to refute statements made in Adams' affidavit. D&D identifies five "hearsay statements" that they argue are contradicted by Martin and should be stricken. *See* R. 47 at 3-7.

As a corporate representative of WME, Adams is "considered to have personal knowledge of the acts of [WME] and an affidavit setting forth those facts is sufficient for summary judgment." *AGI Realty Serv. Grp., Inc. v. Red Robin Int'l, Inc.*, 81 F.3d 160 (6th Cir. 1996) (*citing Catawba Indian Tribe v. South Carolina,* 978 F.2d 1334, 1342 (4th Cir.1992), *cert. denied,* 113 S.Ct. 1415 (1993)). As noted by WME, and not addressed by D&D, Adams' knowledge was based not only on conversations with Martin, but also on "a detailed review of WME's records kept in the ordinary course of business." [R. 37-2 at ¶ 2.] The fact that Martin disagrees with many of Adams statements does not render Adams affidavit inadmissible, but

6

serves as contrary evidence for the Court to consider in opposition to WME's motion. Accordingly, D&D's motion to strike is DENIED.

**B**

Rule 56 provides that a party may move for summary judgment on either an entire claim or defense or a "part of each claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In deciding a motion for summary judgment, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (*citing Liberty Lobby*, 477 U.S. at 255). In terms of burden shifting, the moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Hall Holding*, 285 F.3d at 424 (*citing Celotex*, 477 U.S. at 324.) Moreover, "the

nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Id*. (internal citations omitted).

The trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001) (*citing Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)). Instead, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655.

**1**

Under Kentucky law, "damages for breach of a contract are normally that sum which would put an injured party into the same position it would have been had the contract been performed." *Hogan v. Long,* 922 S.W.2d 368, 371 (Ky.1995) (quoting *Perkins Motors, Inc. v. Autotruck Federal Credit Union,* 607 S.W.2d 429, 430 (Ky.Ct.App.1980)); *see also MW Universal, Inc. v. G5 Capital Partners, LLC*, No. CIV.A. 08-495-KSF, 2012 WL 588743, at *8 (E.D. Ky. Feb. 21, 2012). WME now asks this Court to hold, as a matter of law, that D&D can seek no more than $107,407.74 in damages for its breach of contract and unjust enrichment claims. [R. 37-1 at 6-7.]

The parties agree on the majority of the damage amounts. They agree that the contract was worth $168,000. [R. 1 at ¶ 10; R. 37-2 at ¶ 8 (Adams Aff.); R. 42-1 at ¶ 8 (Burr Aff.)] The parties further agree that WME owed an additional $5,625 for work on the Weddle Project. [R. 23 at 4 (computation of damages); R. 37-8.] Finally, there is no dispute that WME has subsequently paid D&D $43,380.70 ($33,755.70 for the undisputed work performed on the

Somerset project and $5,625 for labor and materials supplied to the Weddle project). [R. 37-1 at 5; R. 37-8; R. 42 at 10]. The only question that must be resolved here is whether D&D has agreed to $22,836.56 in offsets (for the cost of pump rental and the cost of the biological assessment). If D&D's earlier agreement to this offset is to be enforced, then WME's maximum potential liability under counts one and three is $107,407.74

According to D&D, its agreement to these offsets was contingent on WME *immediately* paying D&D its invoice amount in March 2012. [R. 42 at 12-13; R. 42-1 at ¶ 19 (Burr Aff.)] It was Don Burr's understanding that "the environmental assessment was required regardless of [D&D's] work to retrieve the broken reemer heads" so he only agreed to "these offsets based upon Shawn Martin's representation that the WME would immediately pay D&D Underground for its work on this project." [R. 42-1 at ¶ 19 (Burr Aff.)] Because WME did not *immediately* pay its invoice, D&D maintains that it should not be forced to honor its agreement to these offsets. [*Id.*; R. 42-1 at ¶ 19 (Burr Aff.)] In an effort to prove that this has been its longstanding position, D&D refers to paragraphs 16 and 17 of its complaint. In paragraph 16, D&D asserts that "Shawn Martin of Walter Martin informed Don Burr of D&D that if D&D agreed to the two offsets of $5,143.22 from Allied Technology and $17,693.34 for the survey assessment that Walter Martin would pay D&D *immediately* upon D&D's submittal of its invoice." [R. 1 at ¶ 16 (emphasis added).] In paragraph 17, "Relying upon the promise of *immediate payment*, D&D agreed to the two offsets of $5,143.22 and $17,693.34." [R. 1 at ¶ 17 (emphasis added).]

WME argues that D&D's position regarding the conditional payment of offsets is new and points out that D&D's August 2013 computation of damages, prepared nearly eighteen months after WME failed to immediately pay, conceded that the offsets were owed. That

9

computation of damages is reprinted below:

**A) Somerset Project Damages**

| Description: | Amount: |
|---|---|
| Contract Amount: | $168,000.00 |
| Offset of Rental Equipment: | [$5,133.12] |
| Offset for Biological Assessment | [$17,693.44] |
| Balance | $145,163.56 |

[R. 23.] [4] Similar admissions were made in D&D's responses to interrogatories:

> **INTERROGATORY NO. 12:** Identify each element or item of damage related to the allegations in your Complaint, and with respect to each, provide: (a) a full description of the item or element of damage, (b) the amount of each item or element of damage, (c) the components of each item or element of damage, (d) the method of calculating each component of damage, and (e) identify all documents which support, refute, or relate to each element or item of damage.

---

[4] There was a mathematical error in D&D's computation of damages. *See* R. 23 at 3. According to the itemized amounts in its computation of damages, the actual balance for "Somerset Project Damages" should be $145,173.44, rather than $145,163.56. *Id*.

10

```
ANSWER:   Damage:  Rockcastle River Project
                    Subcontract sum:        $168,000.00
                    Allied Invoices:        <$5,143.22>
                    Survey:                 <$17,693.34>
                    Total:                  $145,164.44

                   Weddle Project
                    Balance owed:           $3,125.00

                   Rent of Equipment
                    30 inch reemer          $1,500.00
                    18 inch reemer          $1,000.00

                   Attorney Fees through Jan. 9, 2014    $22,618.42
                   Interest Through Jan. 30, 2014        $34,403.15
```

*Note: Attorney fees will continue to accrue after January 9, 2014 and interest will continue to accrue after January 30, 2014.*

[R. 46-1 at 8-9.] In its reply brief, WME argues that D&D should be bound by its discovery responses. [R. 46 at 5.] The Court agrees. Because D&D conceded the offsets in its discovery responses, it cannot now argue that the offsets are void.

Rule 26 provides that a party must provide "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii). That rule further requires that

> a party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, …--must supplement or correct its disclosure or response…in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process…

Fed. R. Civ. P. 26(e). If "a party fails to provide information … as required by Rule 26(a) or (e), the party is not allowed to use that information … unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

A similar situation was addressed in *Big Lots Stores, Inc. v. Luv N' Care, Ltd.*, where the

11

Sixth Circuit found that the district court acted within its discretion when it held that that Big Lots could not recover damages that "it should have, but did not, disclose that it was seeking during discovery." 302 F. App'x 423, 429 (6th Cir. 2008). The Defendant in that case "had ample reason, after a lengthy discovery period, to be surprised that Big Lots sought additional damages after Big Lots answered interrogatories in a way that indicated that it was not seeking such damages." *Id*. The same logic applies here.

Throughout discovery D&D has consistently conceded the $22,836.56 in offsets. Rule 37 "requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Big Lots Stores, Inc.*, 302 F. App'x at 430 (quoting *Roberts ex rel. Johnson v. Galen of Virginia, Inc.,* 325 F.3d 776, 782 (6th Cir. 2003) (citation omitted)). The error is not harmless and D&D has provided no justification for changing their position on damages. Accordingly, WME's motion for summary judgment is GRANTED to the extent that it seeks to limit damages to $107,407.74 for counts one and three.

**2**

WME also moves for summary judgment on count two of the complaint, which charges a violation of the *Kentucky Fairness in Construction Act*, KRS 371.400 *et. seq.* Amongst other things, the act requires that contractors "pay [their] subcontractors any **undisputed amounts** within fifteen (15) business days of **receipt of payment** from the contracting entity." KRS 371.405(8). The parties disagree, first, what "receipt of payment" means, and second, whether or not the amount WME owed was *disputed* or *undisputed*. The Act is relatively new and the body of law defining its provisions is sparse.

12

First, the Court considers whether the term "payment" is meant to refer to partial payments received throughout the course of the project or only to the final payment, received at the completion of the project. D&D contends that WME was obligated to pay within 15-days of when WME received payment from Somerset, in February 2012, for the work that D&D had performed on the bore. [R. 42 at 14-15; R. 42-2.] WME disagrees, arguing that the 15-day payment window did not open until after they received final payment from Somerset for the entire project, on December 20, 2013. [R. 37-1 at 8.]

The Act does not define "receipt of payment," but the Court is convinced that the legislature intended that WME make payment of any *undisputed amounts* to D&D within 15 days of when they actually received payment for D&D's work in February 2012. As articulated in D&D's response, "[t]he essence of statutory construction is to ascertain and give effect to the intent of the legislature." *Peter Garrett Gunsmith, Inc. v. City of Dayton*, 98 S.W.3d 517, 520 (Ky. Ct. App. 2002) (quoting *Hale v. Combs,* Ky., 30 S.W.3d 146, 151 (2000)). "To ascertain the intent of the legislature, courts should view the statute as a whole, considering not only its language but also its spirit." *Id*. (*citing Combs v. Hubb Coal Corp.,* Ky., 934 S.W.2d 250, 252 (1996). Finally, Kentucky's statutes "shall be liberally construed with a view to promote their objects and carry out the intent of the legislature…" and "all words and phrases shall be construed according to the common and approved usage of language" unless they are given a technical or specific meaning. KRS 446.080 (1) & (4); *see also Peter Garrett Gunsmith, Inc.*, 98 S.W.3d at 520.

An application of the aforementioned principles leads the Court to conclude that WME should have paid *undisputed amounts* to D&D within 15 days of receiving payment for D&D's

13

work from Somerset in February 2012.  The section of the *Kentucky Fairness in Construction Act* that is at issue here puts protections in place to ensure that subcontractors receive timely payment from contractors.  KRS 371.400 (8) and (9).  If, as WME argues, a contractor was not obligated to make payment of *undisputed amounts* until after they received *final payment* for an entire project then subcontractors would be put in the position of extending credit to contractors in a way that would be both financially burdensome for subcontractors and inconsistent with the spirit of the *Fairness in Construction Act.*  For instance, in this case, D&D would have been expected to wait over eighteen-months to be paid over one-hundred thousand dollars even if the amount was undisputed.  In light of the statute's clear intent to protect subcontractors by ensuring that they are paid in a timely manner, the Court is obligated to construe this provision liberally to achieve this end.  *See* KRS 446.080 (1).  Accordingly, the Court finds that, as used in KRS 371.405(8), and as applied in this case, "receipt of payment" refers to when WME received payment from Somerset for D&D's work in February 2012.

  Second, the parties disagree about whether or not the amount owed to D&D was *disputed* or *undisputed*.  These are both terms of art defined within the Act.  The term *undisputed amount* "means a *good faith*, valid, accurate, timely request for payment which has been submitted to any entity owing money, that the recipient of the request for payment has reviewed and agrees that the money is due and owing."  KRS 371.400(11) (emphasis added).  In contrast, a *disputed amount* "means to question in *good faith* the validity, either in whole or part, of a request for payment asserted by any party."  KRS 371.400(5) (emphasis added).

  According to Don Burr, he negotiated a settlement with Shawn Martin and D&D issued an invoice for payment on March 8, 2012, expecting payment soon thereafter.  D&D believes

that at the time the amount was undisputed, triggering WME's obligation to pay within fifteen (15) days of that date or, at the very least, if the amount was disputed, to state its objections to paying that sum. [R. 42 at 15.] WME disagrees, arguing that because the amounts were disputed, there was no FICA violation. In their motion, WME outlines the questions they had about offsets and damages and point out that Somerset actually withheld full payment from WME beyond the time this lawsuit was filed because of the ongoing dispute with D&D. [R. 37-1 at 8; R. 37-4 at Para 15 (Williams Aff.)] Only when Somerset paid in full, in December 2013, did WME pay D&D what they determined to be the then *undisputed amount* of $43,380.70. [R. 37-1 at 8.] WME asks the Court to conclude that before making this payment that they did, in good faith, dispute the amount owed to D&D.

Because genuine issues of material fact exist, the Court cannot grant summary judgment on this count. The question of whether an amount is "disputed" or "undisputed" under FICA requires deciding whether the request for payment or the objections to the request for payment were made in good faith. KRS 371.400(5), (11). While it is clear that WME now contests what it owes to D&D, it does not necessarily follow that the amounts were disputed in March 2012, or if they were disputed, that the dispute was in good faith.

WME's argument that the amounts were disputed as of March 2012 is undercut significantly by the fact that Don Burr cut a deal with Shawn Adams in March 2012. Under that arrangement, Burr agreed to the two offsets totaling $22,836.46. WME was paid by the City of Somerset, and D&D provided an invoice, but WME did not pay D&D. [R. 42 at 9; R. 42-3 (invoice).] Not until July 2012 did WME send a letter outlining additional offsets that WME sought and, even at that time, D&D contends the letter was sent in bad faith. If WME had

disputed the amount owed as of March 2012 why would a deal have ever been negotiated? Why not issue the July 2012 letter in March of that year if the billing was in fact disputed at that time?

"A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " Olinger *v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In deciding a motion for summary judgment, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (*citing Liberty Lobby*, 477 U.S. at 255). If one accepts D&D's version of events, then it is possible that a jury could reasonably conclude that either there was no dispute, or if there was a dispute that it was not in good faith, as of March 2012. For this reason, WME's motion for summary judgment must be **DENIED** as to count two.

### III

For all the aforementioned reasons, WME's Motion for Partial Summary Judgment [R. 37] shall be **GRANTED in PART** and **DENIED in PART**. Furthermore, D&D's Motion to Strike [R. 47.] will be **DENIED**

This the 7th day of May, 2015.



Signed By:
*Gregory F. Van Tatenhove*
United States District Judge